CHRISTOPHER MILLER, et al.,   :

   Plaintiffs,      :

v.            :   Civil Action No.  GLR-14-2303

MARTIN BARRY STRUDWICK, et al., :

   Defendants.     :

## MEMORANDUM OPINION

THIS MATTER is before the Court on: (1) Plaintiffs Christopher Miller and Kathleen Miller's (the "Millers") Motion for Partial Summary Judgment (ECF No. 70); and (2) Defendants Martin Barry Strudwick ("Strudwick"), Stacey Murray, Stephanie Green, Strudwick Management, LLC, Strudwick & Associates, Inc. ("S&A"), Monterey Del Pacifico Partners, LLLP[1] ("Monterey Del Pacifico"), Grupo Del Pacifico Development, LLC, Del Pacifico Sales, LLC, Grupo Del Pacifico Development Venture Sociedad Anonima ("Grupo Venture"), and Monterey De Playa Sociedad Anonima's ("Monterey De Playa") Motion for Partial Summary Judgment (ECF No. 72).  This action arises from the Millers' purchase of real estate in Costa Rica for just over a quarter of a million dollars and subsequent inability to resell the property in accordance with the terms of the underlying purchase and sale agreement.  The parties' Motions are ripe for disposition, and no hearing is necessary.  See Local Rule 105.6 (D.Md. 2016).  For the reasons outlined below, the Court will grant in part and deny in part both Motions.

---

[1] The docket names this defendant as "Monterey Del Pacifico Partners, LLP." The Court will direct the Clerk to amend the docket to reflect this defendant's proper name: "Monterey Del Pacifico Partners LLLP."

# I.  BACKGROUND[2]

In 2008, Defendants piqued the Millers' interest in both S&A's investment advisory services and an opportunity to invest in real estate in Del Pacifico at Esterillos (the "Del Pacifico Project"), located in Puntarenas, Costa Rica.  (Compl. & Demand Jury Trial ["Compl."] ¶¶ 16–27, ECF No. 1).  The Del Pacifico Project was described to the Millers as a "hard asset investment with a solid floor," with emphasis that investors could expect a "guaranteed 40% return" on their investment.  (Id. ¶¶ 18–21).  After visiting the Del Pacifico Project in April 2008, the Millers formalized their relationship with Defendants.  (Strudwick Aff. ¶¶ 13–18, ECF No. 72-3).

In early March 2009, the Millers entered into an Investment Advisory Agreement ("IA Agreement") with S&A.  (Compl. ¶ 27; Inv. Advisory Agreement ["IAA"], ECF No. 70-3).  The Agreement establishes a fiduciary relationship between the Millers and S&A, with Strudwick acting as the latter's representative.  (Compl. ¶ 27).

Two months later, on May 13, 2009, the Millers entered into a Purchase and Sale Agreement ("P&S Agreement") to purchase Lot 11 of the Del Pacifico Project for $265,000.00.  (Id. ¶ 31; Purchase & Sale Agreement ["PSA"], ECF 70-9).  The P&S Agreement indicates that the Millers are the "Buyer" and Monterey De Playa and "affiliated companies," "represented by [Strudwick]," are the "Seller."  (PSA at 1).  Strudwick signed the P&S Agreement on Monterey De Playa's behalf, in his capacity as

---

[2] Unless otherwise noted, the facts outlined here are set forth in the Millers' Complaint (ECF No. 1).  To the extent the Court discusses facts not alleged in the Complaint, they are uncontroverted, and the Court views them in the light most favorable to the party opposing the particular motion for summary judgment.

President.  (Id. at 8).  Under the terms of the P&S Agreement, the Millers purchased Lot 11 by buying 100% of the shares in "White Cloud View W.C. Once S.A." ("White Cloud"), a registered Costa Rican business that was the "legal and sole owner of Lot 11," which, in turn, was owned by Monterrey De Playa.  (Compl. ¶¶ 31–32; PSA at 1).  The Repurchase Provision, located at paragraph 5 of the P&S Agreement, provides the Millers with two options in the event that they chose not to construct a residence on the lot.  (Compl. ¶ 36; PSA at 2).  The Millers selected the second option, "Option B." (Compl. ¶ 37).  It states that, should the Millers exercise Option B within sixty months of the closing date—that is, by May 12, 2014—Grupo Venture, the named third-party "Repurchaser," would be obligated to repurchase from them 100% of the shares of White Cloud for $371,000.00.  (Id. ¶¶ 35–37; PSA at 2).  The repurchase price under Option B amounts to a "40% appreciation" of the price the Millers initially paid for the White Cloud shares.  (Compl. ¶ 38; see PSA 1−2).

Over the next five years, correspondence between the parties tapered off. Approximately four and a half years later, in December 2013, Strudwick informed the Millers that Grupo Venture was on the "brink of failure" and would not be able to fulfill its repurchase obligation under the P&S Agreement.  (Compl. ¶¶ 44, 50–51).  On May 12, 2014, the Millers contacted Strudwick, requesting that Grupo Venture honor the repurchase obligation.  (Id. ¶ 53).  Strudwick informed the Millers that he was seeking new investors to fund the Del Pacifico Project, but that "no return was ever guaranteed." (Id.).

On July 18, 2014, the Millers sued Defendants.  (ECF No. 1).  They filed an eight-count Complaint alleging: breach of the P&S Agreement (Count I); breach of the IA Agreement (Count II); breach of fiduciary duty (Count III); misrepresentation (Count IV); conversion (Count V); violation of N.H. Rev. Stat. Ann. §§ 358-A:1 et seq. (2018) (Count VI), and conspiracy to violate the same (Count VII); and unjust enrichment (Count VIII).  (Compl. ¶¶ 56−96).  The Millers seek double or treble damages and their attorney's fees and costs.  (Id. ¶¶ A−C).

On November 15, 2017, the Millers filed a Motion for Partial Summary Judgment as to Counts I, III, VI, and VII.  (ECF No. 70).  On December 4, 2017, Defendants filed an Opposition (ECF No. 72-1), along with a Motion for Partial Summary Judgment (ECF No. 72) seeking judgment: (1) in their favor as to Counts II−VII; and (2) in favor of all Defendants other than Grupo Venture with respect to Counts I and VIII.  On December 18, 2017, the Millers filed an Opposition to Defendants' Motion.  (ECF No. 74).  To date, the Court has no record that the parties have filed Replies.

## II.        DISCUSSION

### A.   <u>Standard of Review</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable

jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)). This Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249–50.

**B. The Millers' Motion**

**1. Count I – Breach of the Purchase Agreement**

To prevail on a breach-of-contract claim under Maryland law,[3] a plaintiff must show: (1) "a contractual obligation"; and (2) "a material breach of that obligation." Chubb & Son v. C & C Complete Servs., LLC, 919 F.Supp.2d 666, 678 (D.Md. 2013) (quoting Cowan Sys. LLC v. Ocean Dreams Transp., Inc., WDQ-11-366, 2012 WL 4514582, at *3 (D.Md. Sept. 27, 2012)). A breach is material if "it renders any subsequent performance 'different in substance from that which was contracted for,'" or "alters the purpose of the contract in a vital way." Wright Sols., Inc. v. Wright, CBD-12-178, 2013 WL 1702548, at *3 (D.Md. Apr. 18, 2013) (quoting Jay/Dee Mole Joint Venture v. Mayor of Balt., 725 F.Supp.2d 513, 516 (D.Md. 2010)). The issue of "[w]hether a breach of contract is material is normally a question of fact, unless the issue is so clear that it may be decided as a matter of law." White Marlin Open, Inc. v. Heasley, 262 F.Supp.3d 228, 253 (D.Md. 2017) (quoting Whiting-Turner Contracting Co. v. Capstone Dev. Corp., WDQ-12-3730, 2013 WL 5423953, at *8 (D.Md. Sept. 26, 2013)).

---

[3] Because this case arises under the Court's diversity jurisdiction, the Court will apply federal procedural law and state substantive law. See Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 261 n.3 (4th Cir. 2013). Here, with respect to the breach-of-contract claim, the parties' briefs cite almost exclusively to decisions of Maryland state courts. Accordingly, unless otherwise noted, the Court applies Maryland law in resolving the parties' Motions.

### a. Grupo Venture's Liability

The Millers contend that Grupo Venture's breach of the Purchase and Sale Agreement establishes liability. The Court agrees.

In their briefs, the Millers assert that Grupo Venture was contractually obligated to purchase 100% of the White Cloud shares from them for $371,000 in May 2014 under the P&S Agreement. (Mem. Support Pl.'s Mot. Partial Summ. J. ["Pl.'s Mem."] at 17, ECF No. 70-1). They further assert that Grupo Venture breached the obligation by refusing, and continuing to refuse, to pay any portion of the funds owed. (Id.) Defendants concede these assertions. (Answer ¶¶ 57−59, ECF No. 36; Defs.' Mem. Opp'n Pl.'s Mot. Partial Summ. J. & Support Defs.' Mot. Partial Summ. J. ["Defs.' Mem."] at 20, ECF 72-1). Accordingly, the Court will grant the Millers' Motion to the extent it seeks summary judgment against Grupo Venture as to Count I.

### b. Monterey De Playa and Monterey Del Pacifico's Liability

The Millers seek to impose liability for breach of the P&S Agreement against Monterey De Playa and Monterey Del Pacifico.[4] The Millers acknowledge that, "generally, a party who is not a signatory to a contract cannot be held liable for a breach of the contract." (Pls.' Mem. at 18). They nevertheless contend that "Strudwick's control and ownership of [Monterey De Playa] (a party to the P&S Agreement) and

---

[4] In their Complaint, the Millers only allege liability against Grupo Venture and the "Strudwick defendants." Defendant Monterey De Playa is not named as a "Strudwick defendant." Because the Millers therefore have not alleged that Monterey De Playa is subject to any civil liability, the Court will order the Millers to show good cause why Monterey De Playa should not be dismissed within fourteen (14) days of the date of the corresponding Order.

Monterey Del Pacifico . . . compel the conclusion that those entities should aslo [sic] be held liable for breach of the repurchase obligation, as should Strudwick." (Id. at 19).

Maryland courts do not "pierce the corporate veil between a parent and a subsidiary corporation if the subsidiary has some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." Kriesler v. Goldberg, 478 F.3d 209, 213 (4th Cir. 2007) (quoting Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 62 (4th Cir. 1993)).

Here, Monterey Del Pacifico only owns 80% of Monterey De Playa. (Pls.' Mot. Partial Summ. J. ["Pls.' Mot."] Ex. 24 at 1−2, ECF No. 70-26). The remaining 20% is owned by Monterey Park—an entity which, based on Defendants' 103.3 Corporate Disclosure, Strudwick likely owns in full. (Id. at 2; Local Rule 103.3 & FRCP 7.1 Disclosure at 1, ECF No. 37). The parties have not presented evidence that demonstrates Monterey De Playa is under the complete dominion of Monterey Del Pacifico. Monterey De Playa was formed to purchase and hold a 350-acre farm in Costa Rica, and to periodically subdivide the farm and sell parcels and lots. (Monterey De Playa Answers Interrogs. at 3, ECF No. 70-10). And in keeping with this purpose, Monterey De Playa has completed two major sales since its inception—to Villas del Pacifico Esterillos Sun S.A. and Del Pacifico Shopping Center S.A. (Id. at 5−7). Accordingly, the Court will not grant summary judgment in Plaintiff's favor as to Monterey Del Pacifico.

### c.     Strudwick's Liability Under Alter Ego Doctrine

Next, the Millers advance theories of fraud and paramount equity under Maryland's alter ego doctrine as grounds for piercing the corporate veil and imposing personal liability against Strudwick. The Court addresses each theory in turn. At bottom, the Court finds that a genuine dispute of material fact exists as to Strudwick's personal liability.

### i.     Fraud

Under Maryland law, the corporate entity will not be disregarded except "when necessary to prevent fraud or to enforce a paramount equity." Dixon v. Process Corp., 382 A.2d 893, 899 (Md.Ct.Spec.App. 1978).

In Maryland, fraud is established when:

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

Hoffman v. Stamper, 867 A.2d 276, 292 (Md. 2005).

"[M]aking a promise as to a matter material to the bargain with no intention to fulfill it is an actionable fraud." Gross v. Sussez Inc., 630 A.2d 1156, 1161–62 (Md. 1993). The party seeking to pierce the corporate veil based on acts of fraud bears the burden of establishing the fraud. Ramlall v. MobilePro Corp., 30 A.3d 1003, 1010 (Md.Ct.Spec.App. 2011) (quoting Starfish Condo. Ass'n v. Yorkridge Serv. Corp., Inc., 458 A.2d 805, 816 (Md. 1983)), and must do so with "clear and convincing evidence,"

Balt. Line Handling Co. v. Brophy, 771 F.Supp.2d 531, 553 (D.Md. 2011) (quoting

Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc., 728 A.2d 783,

790 (Md.Ct.Spec.App. 1999)). Fraud cases typically "are not suited for disposition by

way of a motion for summary judgment because of the need for factual

development." Abt Assocs., Inc. v. JHPIEGO Corp., 104 F.Supp.2d 523, 536 (D.Md.

2000). State law claims of fraud generally must also comply with Federal Rule of Civil

Procedure 9(b)'s heightened pleading requirements. Spaulding v. Wells Fargo Bank,

N.A., 714 F.3d 769, 782 (4th Cir. 2013).

Defendants contend that the Millers failed to satisfy Rule 9(b)'s heightened

pleading requirements, and failed to pinpoint any instances of intentional

misrepresentation. The Millers counter that any Rule 9(b) argument has been waived,

and that Defendants fraudulently misrepresented their intentions regarding the Del

Pacifico Project. Federal Circuits take different approaches to waiver of Rule 9(b)

claims. Compare Olson v. Fairview Health Servs. of Minn., 831 F.3d 1063, 1073 (8th

Cir. 2016) ("Rule 9(b)'s pleading standard is not an affirmative defense that is waived by

a defendant's failure to raise it."), with CSS INC., v. Fibernet, L.L.C., No. 6:07-CV-

00505, 2007 WL 6965365 (S.D.W.Va. Nov. 28, 2007) (holding that a defendant's failure

to raise a Rule 9(b) argument either contemporaneous to or before its answer waives the

argument).

The United States Court of Appeals for the Fourth Circuit has not clearly weighed

in on this issue, so this Court follows the weight of persuasive authority and concludes

that Rule 9(b) is governed by the same timing and waiver rules as Rule 12(b). See, e.g.,

In re U-Fill'Er-Up, Inc., No. CIV 2:95CV95, 1996 WL 33676773, at *3 (D.NC. March 1, 1996) ("The same time limits that apply to motions under 12(b) have been held to apply to those under Rule 9(b)."); Fed.R.Civ.P. 12(h)(1). Because Defendants did not raise their Rule 9(b) arguments either contemporaneous with or prior to their responsive pleading, these arguments have been waived.

Here, the Millers allege substantial evidence of fraud.[5] First, the Millers suggest that the P&S Agreement was intentionally structured so that neither Monterey De Playa ("the Seller") nor Grupo Venture ("the Repurchaser") could be held liable for breach of contract. (Pls.' Mot. at 20–21, ECF No. 70-1). Under the terms of the P&S Agreement, Monterey De Playa has no repurchase obligation. (PSA at 2). And while the repurchase clause obliges Grupo Venture to repurchase 100% of White Cloud shares after five years, Grupo Venture never signed the contract. (Id.).[6] Further, none of the profits from the Millers' purchase of Lot 11 went to either Monterey De Playa or Grupo Venture.

_____

[5] The Millers pled misrepresentation—Count IV—rather than "fraud." (Compl. ¶¶ 71–77). But under Maryland law, a claim of intentional misrepresentation is coextensive with a claim of fraud. See Miller v. Fairchild Indus., Inc., 629 A.2d 1293, 1304 (1993) (referring to the "fraud/deceit/intentional misrepresentation claim"); SpinCycle, Inc. v. Kalender, 186 F.Supp.2d 585, 590 (D.Md. 2002) (concluding that the same elements define "fraud/intentional misrepresentation" under Maryland law). Additionally, the Fourth Circuit has long adhered to the federal policy in favor of resolving cases on their merits. See Sirona Dental Sys., LLC v. Stevenson Grp., Inc., No. CIV. CCB-12-1253, 2013 WL 3875325, at *4, n.4 (D.Md. July 25, 2013) (holding fraud sufficiently pled even though the separate claim for fraud was dropped when plaintiffs amended their complaint because "the amended complaint still contains the same factual allegations of fraud").

[6] A handwritten note on the P&S Agreement states that Stacey Murray, an S&A and Grupo Venture employee, told the Millers that Strudwick would initial the repurchase clause, presumably, as a Grupo Venture representative. (Id.). But he never did. (Id.).

(Strudwick Answers Interrogs. at 9, ECF No. 70-29). Instead, Monterey Del Pacifico received 80% of the profits, and Monterey Park S.A. received the remaining 20%. (Id.). Finally, Grupo Del Pacifico—by all appearances, the standard "repurchaser" for sales of land in the Del Pacifico Project—has never owned land. (Grupo Venture Answers Interrogs. at 7, ECF No. 70-7).

The Millers have also presented evidence that after the sale of Lot 11, Defendants took affirmative steps to hide Grupo Venture's economic woes. Grupo Venture documents, drafted by Strudwick, reveal that the Del Pacifico Project faced "horrible market" conditions, and asked investors whether they should consider "liquidating at a price below the 'break even' point." (Pls.' Mot. Ex. 21 at 1, 8, ECF No. 70-23). Yet, on October 29, 2013, when Strudwick filled out a Fair Market Valuation form for the Millers, he listed both the purchase price and the current asset value of Lot 11 as $250,000.00, seemingly ignoring the dire economic straits he previously described. (Pls.' Mot. Ex 40, ECF No. 70-42). And confoundingly, the Millers paid $265,000.00 for Lot 11, (Pls.' Mot. Ex. 7, ECF No. 70-9), not $250,000.00. A jury might therefore infer that Strudwick mistakenly believed the Millers had paid $250,000.00, and, intending to convey that the investment had not lost any value, mechanically listed its current asset price as $250,000.00. Further, when the Millers ultimately confronted Strudwick about Grupo Del Pacifico's illiquidity in October 2013, he responded "no return was ever guaranteed." (Pls.' Resp. Opp'n Defs.' Mot. J. Pleadings ["Pls.' Resp. Opp'n"] Ex. K, ECF No. 64-11).

For their part, Defendants have presented no evidence that Grupo Venture intended to fulfill its repurchase obligations at the time the P&S Agreement was executed, or that Grupo Venture was ever in a financial position to fulfill its repurchase obligations. Instead, they deny "that any misrepresentation was intentional," (Answer ¶ 75), and maintain that in 2014, at the time Millers exercised Option B, Grupo Venture could not fulfill its repurchase obligations because of the economic downturn of 2008. (Defs.' Mem. & Mot. at 9, ECF No. 72-1; Pls.' Mot., Ex. 8, ECF No. 72-10).

This Court therefore finds that the Millers' evidence allows for substantial inferences of fraud. Because the Court must resolve all rational inferences in the light most favorable to the nonmoving party, the question of fraud is left for the jury.

## ii. Paramount Equity

At bottom, the Court finds that whether or not the facts establish a paramount equity that justifies piercing the corporate veil is a close question that would be best resolved by the jury.

What rises to the level of "paramount equity" has defied easy definition, but it must be an equity "paramount to the ordinary expectation of limited liability on the part of the shareholder." Starfish Condo., 295 Md. at 714. In assessing paramount equity, courts consider:

> (1) whether the corporation is adequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

Hildreth v. Tidewater Equip. Co., 838 A.2d 1204, 1210 (Md. 2003).

Piercing the corporate veil in Maryland has been described as a "herculean task." Dixon, 382 A.2d at 894–95. And, only recently has a court found that, as a matter of law, a paramount equity justified casting aside the corporate shield. See Aldmyr Sys., Inc. v. Friedman, 215 F.Supp.3d 440, n.33 (D.Md. 2016) (paramount equity justified piercing corporate veil when husband brought baseless suit against wife to confound ongoing, parallel divorce proceedings), aff'd, 679 F.App'x. 254 (4th Cir. 2017).

Here, the Millers allege substantial evidence of paramount equity. First, they note that Strudwick used a complex network of corporate organizations to shield himself from personal liability: Strudwick owns 100% of Strudwick Management, LLC; 100% of S&A; 1.5% of Monterey Del Pacifico; 100% of Grupo Del Pacifico Development, LLC; 100% of Del Pacifico Sales, LLC; 100% of Grupo Venture; and 20% of Monterrey Del Playa, and Strudwick was the Corporate Secretary of White Cloud at the time the Purchase Agreement was executed. (Answer ¶ 3; Pls.' Mot. Ex. 26, ECF No. 70-28; Local Rule 103.3 Disclosure at 1). Several of these corporations—Monterey Del Pacifico (Pls.' Mot. Ex 25 at 4, ECF No. 70-27), Monterey Del Playa (Id. Ex. 8 at 4, ECF No. 70-10), and Strudwick Management, LLC (Id. Ex. 29 at 4, ECF No. 70-31)—have no employees.

Further, the Millers contend that Strudwick's position as their financial advisor and his abuse of this position in inducing their investment in the Del Pacifico Project distinguish the present case from past cases where courts have declined to find a paramount equity. (Pls.' Resp. Opp'n Defs.' Mot. Summ. J. at 4, ECF No. 74). The

Millers have presented evidence that demonstrates Strudwick gave financial advice regarding their investment in Costa Rica: Strudwick gave tax advice regarding the investment (Pls.' Resp. Opp'n. Ex. R at 1, ECF No. 64-18); he advised the Millers on how they could execute their purchase of Lot 11 (Id. Ex. Q at 1, ECF No. 64-17). For their part, Defendants argue that the Millers were informed from the start that Strudwick's work as their financial advisor did not extend to his involvement in the Del Pacifico Project. (Defs.' Mot. at 7–8, ECF No. 72). A genuine dispute therefore exists regarding whether Strudwick, acting as the Millers' financial advisor, encouraged their investment in Lot 11.

Because the paramount equity inquiry is inherently fact-based, and the facts of this case are unique in pitting the state's interest in a corporation's limited liability against the state's interest in the sanctity of fiduciary relationships, the existence of a paramount equity is a question best left for the jury.

### 2.    Count III – Breach of Fiduciary Duty

"Maryland does not recognize a separate tort action for breach of fiduciary duty." Int'l Brotherhood of Teamsters v. Willis Corroon Corp. of Md., 802 A.2d 1050, 1051 n.1 (2002). Instead, "the breach of a fiduciary duty may give rise to one or more causes of action, in tort or in contract." Id. Because the Millers' allegations of breach of fiduciary duty are premised on a breach of contract claim, the Court merges the breach of fiduciary duty claim into the claim of breach of the IA Agreement. See In re Council of Unit Owners of 100 Harborview Drive Condo., 584 B.R. 639, (Md.Br.Ct. 2018) (citing Vinogradova v. Suntrust Bank, Inc., 875 A.2d 222, 231 (Md.Ct.Spec.App. 2005)

("[U]nder Maryland law, the two separately pleaded claims in [the Plaintiff's] complaint condense to only one: the claim based on the tort of negligence.")).

The Court, therefore, will deny the Millers' Motion as to Count III.

### 3. Counts VI and VII – Violation of and Conspiracy to Violate N.H. Rev. Stat. Ann. §§ 358-A:1 et seq.

New Hampshire's Consumer Protection Act states, "It shall be unlawful for any person to use any unfair method of competition or unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. State. Ann. § 358-A:2. Under the Act, a "person" refers to "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity." § 358-A:1. "Trade" and "commerce" refers to "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated," including "any trade or commerce directly or indirectly affecting the people of this state." Id. The Act governs real estate transactions. See Snierson v. Scruton, 761 A.2d 1046, 1051 (N.H. 2000).

Defendants argue that the Court should grant summary judgment as to Counts VI and VII because the Millers fail to meet Rule 9(b)'s heightened pleading requirement, and because Defendants have not engaged in practices that fall within the Act's reach. The Court considers each argument in turn.

As discussed in relation to fraud, this Court finds that Rule 9(b) arguments are waived if not raised contemporaneous with or prior to a party's responsive pleading.

Because Defendants first raised this argument in their Motion for Judgment on the Pleadings on November 28, 2016, more than nine months after they filed their Answer, these arguments are waived.

Defendants also argue that they did not engage in trade or commerce within New Hampshire. But this statute only requires that the <u>offending conduct</u> occur within New Hampshire. <u>See</u> <u>Environamics Corp. v. Ferguson Enters., Inc.</u>, No. 00-579-JD, 2001 WL 1134727 (D.N.H. Sept. 24, 2001) (holding § 358-A applied to the shipment of a contaminated pump to New Hampshire because the deceptive act of misrepresenting the pump's condition "occurred in New Hampshire when the [party] received the pump and its allegedly false documentation."). Because Defendants sent countless letters and emails to the Millers in New Hampshire, some of which form the bases for the Millers' claims of misrepresentation, (Pls. Mot. Ex. 40; <u>Id.</u> Ex. 10, ECF No. 70-12; <u>Id.</u> Ex. 3, ECF No. 70-5; <u>Id.</u> Ex. 4, ECF No. 70-6), the Act's geographic requirements have been satisfied.

A closer question arises as to whether the defendants' acts—the same acts which underlie the Millers' alter ego and misrepresentation arguments—rise to the level of an "unlawful act" under the Act. The Statute delineates a non-exhaustive list of "prohibited practices." N.H. Rev. Stat. Ann § 358-A:2. And the Millers have argued that Defendants' conduct likely falls under either of two categories of actionable conduct: (1) "causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services"; or (2) "causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by

another." (Pls.' Resp. Opp'n at 22). The Millers further emphasize that even if Defendants' conduct is not proscribed under one of the Act's explicit categories of prohibited conduct, the Act also penalizes conduct that falls within the rascality test deployed by the New Hampshire Supreme Court. See id.; C.Y. Assets Invs. v. Kuhn, No. 05-E-544, 2008 WL 6630066 (N.H.Sup.Ct. July 31, 2008). "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id.

Deploying the rascality test, New Hampshire courts have found that knowing misrepresentations violate the Act. See, e.g., C.Y. Assets, 2008 WL 6630066 (real estate broker's willful misrepresentations to buyer violated the Act). Because the Court finds that the existence of misrepresentation is a question best left for the jury, as discussed below, the Court cannot find that no genuine dispute as to a material fact exists or conclude that either party is entitled to judgment as a matter of law on either Count VI or Count VII.

This Court, therefore, will deny the Millers' Motion as to Counts VI and VII.

**C.      Defendants' Motion**

**1.      Count I – Breach of the Purchase Agreement**

Defendants contend that Grupo Venture is the only party that had an obligation under the P&S Agreement to purchase the Millers' shares in White Cloud. Defendants further contend that the Millers' theory of alter ego liability must fail as a matter of law. As previously discussed, the Millers have submitted evidence of fraud and paramount equity. Because the Court must draw all inferences in favor of the nonmoving party, it

cannot hold that as a matter of law that Defendants are entitled to summary judgment. Accordingly, the Court will deny Defendants' Motion as to Count I.

### 2.    Count II – Breach of the IA Agreement

At bottom, this Court finds that a genuine dispute of material fact exists as to the scope of the IA Agreement as to Defendants Strudwick and S&A.

The parties agree that the IA Agreement created a fiduciary relationship between S&A and the Millers.   (Answer ¶ 27).[7]   The IA Agreement states, "The Advisor represents that it is registered as an investment advisor under the Investment Advisor Act of 1940." (IAA at 3).[8] Defendants admit that the IA Agreement required S&A, acting through Strudwick, to provide "independent investment advice," (id. ¶ 27), but contest that it required S&A to "act solely" for the Millers' benefit (id. ¶ 65).

The parties contest the scope of this fiduciary relationship.  The Millers argue that the Del Pacifico Project investment fell within this relationship, whereas Defendants contend that the Del Pacifico Project exceeded the relationship's scope.   Specifically, Defendants contend that S&A "limited its advice to marketable securities and refrained from advising the Millers regarding Costa Rican real estate." (Pls.' Resp. Opp'n at 9).

---

[7] There is, however, a factual dispute as to when this relationship commenced. The Millers signed the Agreement on March 6, 2009.  (Compl. ¶ 27; Pls.' Mot. Ex. 1 at 4). But S&A produced internal notes that indicate that Strudwick discussed forming an advisory relationship with the Millers on March 16, 2009.  (Defs.' Mot. Ex. 3, ECF No. 72-5).  And Strudwick's affidavit states that he had a call with the Millers on March 18, 2009 to discuss forming an advisory relationship.  (Strudwick Aff. ¶ 15).

[8] The Millers have presented evidence, however, that shows S&A's registration expired on October 15, 2012, though it continued to serve as the Millers' financial advisor through February 3, 2014.  (Pls.' Resp. Opp'n at 7).

But the Millers have presented evidence suggesting that S&A advised the Millers on various aspects of their purchase of Lot 11. Using his S&A email, Strudwick provided the Millers tax advice regarding Lot 11, (Pls.' Resp. Opp'n Defs.' Mot. Ex. R), he advised the Millers on how they could formally execute their purchase of Lot 11, (Id. Ex. Q), and he advised them on how to set up a self-directed IRA for the Lot 11 investment, (Compl. ¶ 33; Miller Aff. ¶ 5, ECF No. 64-22). Strudwick also filled out a Fair Market Valuation form for the Millers' self-directed IRA custodian, Equity Trust Company, that estimated Lot 11's current value. (Pls.' Mot. Ex. 40).[9]

And the Millers contend that the line between S&A's advisory work and the involvement of its employees in the Del Pacifico venture was consistently blurred. Stacey Murray, an S&A employee who did "incidental work" for Grupo Venture, (Defs.' Mot. ¶ 40, ECF No. 63-3), sent the Millers a letter on S&A letterhead that stated, "Barry and I . . . hope you will be joining us in Costa Rica." (Pls.' Mot. Ex. 2, ECF No. 70-4). From her S&A email, and with an S&A signature block, Murray also provided the Millers with instructions for making a deposit on Lot 11. (Pls.' Resp. Opp'n. Ex. S, ECF No. 64-19). And after the Millers purchased Lot 11, Murray provided the Millers with a proof of ownership letter that stated the investment "guaranteed a buy-back plan within a term of 5 years at 40% profit." (Pls.' Mot. Ex. 10). Additionally, S&A's website

_____

[9] The Valuation form notes that it must be completed by a "qualified, independent third party." (Pls.' Mot. Ex. 40). That Strudwick—the Millers' financial advisor, and 100% owner of Grupo Venture, managing/general partner and 1.5% owner of Monterey Del Pacifico, and managing partner of White Clouds—would complete the form therefore bolsters the Millers' contention that his full involvement in the Del Pacifico Project was not clear to the Millers.

highlighted a New York Times article that discussed the Del Pacifico Project and its guaranteed repurchase plan—the same repurchase plan the Millers ultimately partook in. (Pls.' Resp. Opp'n. at 9–10, ECF No. 64).

Defendants maintain that Strudwick told the Millers that S&A's advisor role did not extend to Costa Rican real estate. (Strudwick Aff. ¶ 16). Defendants further contend that by executing the IA Agreement the Millers acknowledged that they had received the "ADV Form," which outlines Strudwick's management position in Monterey Del Pacifico and states that he allows clients to invest in these related investment partnerships "based on [the clients'] decision and analysis," and that S&A's internal code of ethics is to "give objective advice and allow the individual to reach his/her own conclusion as to the potential and the risks of any investments." (Defs.' Mem. Ex. 2 at 11, ECF No. 72-4). The Millers contend that they never received the ADV form and that the form was never explained to them. (Pls.' Resp. Opp'n at 16).

Because a genuine dispute exists as to a material fact—whether S&A's financial advisor relationship extended to the Millers' investment in Lot 11—this Court will deny Defendants' Motion as to Count II.

### 3.    Count III – Breach of Fiduciary Duty

As previously discussed, Maryland courts do not recognize a standalone claim for breach of fiduciary duty. Int'l Brotherhood, 802 A.2d at 1051 n.1. Instead, breach of fiduciary duty gives rise to a claim in tort or contract law. Id. The Millers' standalone claim for breach of fiduciary duty merges with Count II for breach of the IA Agreement. The Court, therefore, will grant Defendants' Motion as to Count III.

### 4.    Count IV – Misrepresentation

Under Maryland law, a claim for misrepresentation arises when: "(1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation as made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation." Hoffman, 867 A.2d at 292.

The Millers allege four specific misrepresentations: (1) there was a "guaranteed" repurchase plan for the Del Pacifico Project; (2) Grupo Venture was expecting a letter of interest from a "major 5 star resort" imminently that would increase demand and prices within the Del Pacifico Project; (3) representations to third parties concerning the value of Lot 11; (4) representations of independence and qualification in connection with a sworn Fair Market Valuation form.  (Compl. ¶ 73).

As to the purported misrepresentations regarding the "guaranteed" 40% rate of return on investments in the Del Pacifico Project, the Millers present evidence that Murray sent them a letter on December 19, 2008, recapping Strudwick's description of the Del Pacifico Project's "guaranteed" 40% return after five years, (Pls.' Mot. Ex 3), and that Strudwick led a conference call on December 30, 2008, which emphasized that Grupo Venture would "repurchase the lot for a 40% appreciation," (id.; Pls.' Mot. Ex. 4). Defendants have not contested this evidence, but instead argue that Grupo Venture intended to honor its obligation to repurchase the Millers' lot for a 40% appreciation, but

could not do so because of the 2008 financial downturn. (Strudwick Aff. ¶ 26). Because Defendants have moved for summary judgment as to this Count, the Court must construe all inferences in favor of the Millers. In doing so, the Court finds a genuine dispute of fact with respect to Defendants' intent. The Court therefore will deny Defendants' Motion on this ground.

As to the impending partnership with a "major 5 star branded resort/hotel group," Defendants present evidence that Strudwick signed a letter of intent with RockResorts International LLC, an affiliate of Vail Hospitality on February 9, 2009. (Defs.' Mem. Ex. 9, ECF No. 72-11). Strudwick signed a formal operating agreement with Vail Hospitality and Resorts on December 13, 2010. (Id.; Defs.' Mem. Ex. 12, ECF No. 72-14). Defendants' statements to the Millers regarding this planned partnership occurred during the Fall of 2008, just a few months before the letter of intent with Rock Resorts was signed. (Pls.' Mot. Ex. 6, ECF No. 70-8; Pls.' Resp. Opp'n Ex. P, ECF No. 64-16). The Millers have not presented any evidence that would debunk Defendants' contention that they were negotiating a partnership with a major resort group. This Court therefore grants Defendants' Motion for Summary Judgment on this ground.

The Court turns now to the Millers' claim that Defendants made misrepresentations regarding Lot 11's value to third parties—the Millers' bank and Equity Trust, the custodian of the Millers' self-directed IRA. In support of this claim, the Millers present a proof of ownership letter that Murray drafted for the Millers on August 14, 2009, which states that the Millers purchased Lot 11 for $265,000.00 and "guaranteed a buy-back plan within a term of 5 years at 40% profit," (Pls.' Mot. Ex. 10), and a Fair

Market Valuation form which Strudwick completed that lists the Lot's current value as $250,000.00, (Id. Ex. 40). Strudwick denied authorizing the August 14, 2009 letter. (Strudwick Answers Interrogs. at 9). Murray contends that she does not "recall the events giving rise to the creation of the letter" but that it is her present understanding that Kathleen Miller "needed the letter for her bank and specified the letter's content." (Murray Answers Interrogs. at 7–8, ECF No. 70-39). Defendants have not contested that Strudwick completed the Fair Market Valuation form, and have presented no evidence to demonstrate what Lot 11's fair market value was at the time the Fair Market Valuation form was completed. Without more information regarding Murray's intent in drafting the August 14, 2009 letter, or more information regarding the true fair market value of Lot 11 at the time Strudwick completed the Fair Market Valuation form, the Court is unable to conclude that no genuine dispute of material fact exists. Accordingly, the Court will deny Defendants' Motion on this ground.

Finally, the Millers contend that Strudwick made misrepresentations of qualification and objectivity in completing the Fair Market Valuation form. Defendants have not presented evidence to demonstrate why Strudwick, the Millers' financial advisor, and 100% owner of Grupo Venture, would be in a position to give an independent valuation of Lot 11's value. Because a genuine dispute of alleged material fact exists as to the material misrepresentation, the Court denies Defendants' Motion on this ground.

### 5. Count V – Conversion

Under Maryland law, a conversion is "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." Darcars Motors of Silver Spring, Inc. v. Borzym, 841 A.2d 828, 835 (Md. 2004). Generally, "monies are intangible and, therefore, not subject to a claim for conversion." Allied Inv. Corp. v. Jasen, 731 A.2d 957, 966 (Md. 1999). But a claim of conversion may stand if the party seeks "funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction," provided that the transferred money is "sufficiently identifiable." Id. at 966 (citations and quotations omitted). When a defendant commingles funds with other money, it "loses its specific identity," and a claim of conversion fails. Id. at 967; see also Gibbons v. Bank of Am. Corp., JFM-08-3511, 2012 WL 94569, at *9 (D.Md. Jan. 11, 2012).

Here, it is uncontested that Defendants deposited 80% of the funds the Millers paid for Lot 11 in Monterey Del Pacifico's general operating account, and the remaining 20% in Monterey Park S.A.'s general operating account. (Strudwick Answers Interrogs. at 9). Because the Millers' money has been commingled with other funds, their claim of conversion cannot stand as a matter of law. The Court, therefore, grants Defendants' Motion as to Count V.

6. **Counts VI and VII – Violation of and Conspiracy to Violate New Hampshire's Consumer Protection Act**

Both Counts related to New Hampshire's Consumer Protection Act hinge on a finding of misrepresentation. Because the Court concludes that the issue of misrepresentation is best left to the jury, the Court cannot find that no genuine dispute exists as to any material fact or that Defendants are entitled to judgment as a matter of law as to either of these Counts. The Court, therefore, denies Defendants' Motion as to Counts VI and VII.

7. **Count VIII – Unjust Enrichment**

Under Maryland law, a claim for unjust enrichment exists when: "(1) a benefit conferred on the defendant; (2) the defendant knew and appreciated the benefit; and (3) under the circumstances, the defendant's acceptance or retention of the benefit would be inequitable." Jones v. Pohanka Auto N., Inc., 43 F.Supp.3d 554, 573 (D.Md. 2014).

But this cause of action only lies for quasi-contracts, alternatively termed contracts implied in law, where there is no meeting of the minds but the law demands "restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense." Mass Transit Admin. v. Granite Constr. Co., 471 A.2d 1121, 1125 (Md.Ct.Spec.App. 1984).

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those

27

> expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow.

Id. at 1126 (quoting Indus. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp., 432 N.E.2d 999, 1002 (Ill.App.Ct. 1982); see also J. Roland Dashiell & World Publ'ns, Inc., 999 F.Supp. 640, 642 (D.Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."). A party may, however, plead breach of contract, and in the alternative, unjust enrichment, if the breach of contract claim includes an allegation of fraud. See Jones, 43 F.Supp.3d at 573; Kwang Dong Pharm. Co. v. Han, 205 F.Supp.2d 489, 497 (D.Md. 2002). But a party may not recover under both theories. Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc., 190 F.Supp.2d 785, 792 (D.Md. 2002).

Here, the P&S Agreement covers the same subject matter as the Millers' claim for unjust enrichment. Because neither party disputes the validity or enforceability of the Agreement, and in light of the Court's prior determination that Grupo Venture is liable under the P&S Agreement, the Millers' may not recover on a claim for unjust enrichment. Accordingly, the Court will grant summary judgment in favor of all Defendants except for Grupo Venture as to Count VIII.

### III.        CONCLUSION

For the foregoing reasons, the Court will: (1) grant in part and deny in part the Miller's Motion for Partial Summary Judgment (ECF No. 70); and (2) grant in part and

deny in part Defendants' Motion for Partial Summary Judgment (ECF No. 72).   A separate order follows.

_____/s/_____

George L.  Russell, III

United States District Judge